**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

Civil Action No.: 1:20-cv-12003

STORAGE CAP LEASING, LLC, a Nevada limited liability company, and
STORAGE CAP MANAGEMENT, L.P., a Nevada limited partnership,

      Plaintiffs,

vs.

WOODNB, LLC, a Texas limited liability company,
DLWFT 91 COVE, LLC, a Texas limited liability company,
WOODFR, LLC, a Texas limited liability company,
DENNIS L. WOOD, both individually and as the
Trustee of the Alberta P. Wood and Dennis L. Wood Family Trust, and
WILLIAM FARRAR,

      Defendants.

---

## COMPLAINT

For their Complaint, Storage Cap Leasing, LLC ("Storage Cap") and Storage Cap Management, L.P. ("Storage Cap Management") state and allege:

1.      Storage Cap brings this action to recover the damages it has incurred as a direct result of its interactions with defendants leading up to and following the signing of an April 8, 2020 Agreement for Purchase and Sale, as amended ("PSA"), into which agreement defendants induced Storage Cap to enter with their misrepresentations and deliberate omissions of material facts as to the condition of the properties that were the underlying value for the transactions for which the PSA provided.

2.      The PSA governs the potential acquisition of two separate projects. One is located in Fall River, Massachusetts, and is the project as to which WoodFR misrepresented and omitted to disclose the true facts as to the environmental condition of and remediation requirements for the property. One is located in New Bedford, Massachusetts, and is the project

as to which WoodNB and DLWFT misrepresented and omitted to disclose the true facts as to

their compliance with the building plans that the City of New Bedford had approved and their

construction of the remaining improvements on the property.

3.      The PSA also contains confidentiality provisions that WoodNB breached and has

thereby damaged Storage Cap.

4.      Storage Cap Management brings this action to recover the damages it has incurred

as a direct result of its interactions with defendants leading up to and following the signing of a

July 2020 Temporary Property Management Agreement ("TPMA"), into which agreement

defendants induced Storage Cap Management to enter with their misrepresentations and

deliberate omissions of material facts as to the condition of the New Bedford property.

## Parties

5.      Storage Cap Leasing, LLC ("Storage Cap")  is a Nevada limited liability company

with its principal place of business located in Winter Garden, Florida.

6.      Storage Cap's members are Chris Harris and Rob Consalvo. Neither one of

Storage Cap's members are citizens of, or have their principal places of business located in,

Oklahoma or Texas.

7.      Storage Cap Management, L.P. ("Storage Cap Management") is a Nevada limited

liability company with its principal place of business located in Winter Garden, Florida.

8.      Storage Cap Management's general and limited partners are neither citizens of,

nor have their principal places of business located in, Oklahoma or Texas.

9.      WOODNB, LLC ("WoodNB") is a Texas limited liability company with its

principal place of business located in Haskell, Oklahoma.

10.     Storage Cap is informed from the parties' PSA and on that basis believes that the members of WoodNB are Dennis L. Wood, and the Alberta P. Wood and Dennis L. Wood Family Trust, a/k/a the Dennis L. Wood Family Trust (the "Trust").  Dennis L. Wood is the trustee for that Trust.  Both members of WoodNB, and the trustee of the Trust, are citizens and residents of the State of Oklahoma.

11.     DLWFT 91 Cove, LLC ("DLWFT") is a Texas limited liability company with its principal place of business located in Haskell, Oklahoma.

12.     For DLWFT, Storage Cap is informed and on that basis believes Dennis L. Wood is a member, and the Trust may also be a member.  The member or members of DLWFT are citizens and residents of the State of Oklahoma.

13.     WOODFR, LLC ("WoodFR") is a Texas limited liability company and an affiliate of WoodNB, Wood and Farrar, with its principal place of business located in Haskell, Oklahoma.

14.     Storage Cap is informed from the parties' PSA and on that basis believes that, as with WoodNB, the members of WoodFR are Wood and the Trust.  Both members of WoodFR, and the trustee of the Trust, are citizens and residents of the State of Oklahoma.

15.     Dennis L. Wood is a citizen and resident of the State of Oklahoma.

16.     William D. Farrar is a citizen and resident of the State of Texas.

**Jurisdiction and Venue**

17.     This Court has subject matter jurisdiction over this action under the diversity jurisdiction for which 28 U.S.C. § 1332 provides.  This is an action between citizens of different states and the amount in controversy exceeds $75,000.

18.    Venue for this action is proper in this District under 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to Storage Cap's claims occurred in this District, and the real property that is the subject of this action is located in this District.

19.    This Court has personal jurisdiction over WoodNB, DLWFT and WoodFR because:  (a) each entity owns interests in real property, improvements, and associated personal property located in the Commonwealth; and (b)  each of these foreign limited liability companies has filed with the Secretary for the Commonwealth a Foreign Limited Liability Company Application for Registration (General Laws Chapter 156C, Section 48) as is required for every foreign limited liability company doing business in the Commonwealth.  With that filing, both WoodNB, DLWFT and WoodFR admit they are transacting business generally in the Commonwealth.

20.    This Court has personal jurisdiction over Wood and Farrar because individually and as the co-managers of WoodNB, DLWFT and WoodFR they both, either directly or through an agent:  (a) regularly do business and have engaged in other persistent conduct in the Commonwealth in connection with the New Bedford Facility and the Fall River Facility that are the subjects of this action; (b) have caused tortious injury in the Commonwealth; (c) knowingly acted and/or omitted to act both in and outside of the Commonwealth where those actions and/or omissions have caused, and both of them knew or should have known they would cause, damages in the Commonwealth; and (d) have an interest in the New Bedford Facility and the Fall River Facility, both of which are located in the Commonwealth and are the subjects of this action.  Each of these actions subjects Wood and Farrar to "long-arm" personal jurisdiction under the General Laws, Part III, Title II, Chapter 223A, Section 3.

**Statement of Facts**

21.     On April 8, 2020, WoodNB, DLWFT, WoodFR and Storage Cap entered into the Agreement for Purchase and Sale ("PSA").

22.     The basic structure of the PSA was that WoodNB, DLWFT and WoodFR would cause the ownership of the New Bedford Facility and the Fall River Facility to be transferred to two new limited liability company owners, respectively, New LLC1 and New LLC2, and the owners of those entities would, respectively, then transfer their membership interests to Storage Cap or one of its affiliated assigns.  (Subject to certain terms and conditions in the PSA, Storage Cap also had the option to elect to acquire directly the fee interests in the New Bedford Facility and the Fall River Facility.)

**A.     The Background for and Provisions of the PSA Affecting Storage Cap's Purchase of the Property Located at 749 Quequechan Street, Fall River**

23.     WoodFR is the owner and operator of the real property, improvements and self-storage business located at 749 Quequechan Street in Fall River, Massachusetts, which real property, improvements, personal property and self-storage business are collectively referred to herein as the "Fall River Facility".

24.     The PSA provided for Storage Cap to purchase 100% of the membership interests in the New LLC2, which was to be formed by the Current Owners to be the owner of the Fall River Facility, for $13.5 million.  Section 1.1.2 of the PSA defines the "Current Owners" as Dennis L. Wood, Alberta P. Wood, and the Trust.

25.     WoodFR made Storage Cap aware of the fact that the Fall River Facility was the subject of environmental contamination and an ongoing environmental remediation efforts related to the property's prior use.  [PSA, Exh. G].

**B.      The Current Owners and WoodFR's False Statements and Material Omissions Made to Induce Storage Cap to Enter Into the PSA**

26.      The Current Owners and WoodFR misrepresented the extent of environmental contamination, their investigation of the contamination, and both the extent and costs of the remediation needed to make the Fall River Facility a viable commercial property on which Storage Cap could obtain financing, and omitted material facts they knew or should have known Storage Cap would want to know as each of these matters.

27.      These statements they made were false, and known to be false, when the Current Owners and WoodFR made them.

28.      These material matters the Current Owners and WoodFR concealed from Storage Cap were matters they omitted knowing they were material and matters Storage Cap would need to and/or would want to know.

29.      In March 2019, before the parties entered into the PSA, Wood told Ashley Compton, the broker, that WoodFR was in the final stages of the environmental remediation of the Fall River Facility and that it would be resolved by the end of the summer.

30.      As part of its due diligence during the Inspection Period, Storage Cap commissioned a Phase I environmental investigation of the Fall River Facility.  After receiving the Phase I report from its consultant, Storage Cap spoke with WoodFR's environmental consultant in June 2019.  WoodFR's consultant then told Storage Cap the actual timeline for remediation would more likely be completed in December 2020/January 2021.

31.      Storage Cap had a discussion with its consultant and its partners, and the partners requested a further review by their preferred environmental consultant.  That consultant reviewed all of the documentation and spoke with WoodFR's consultant (the same consultant that had previously told Storage Cap that WoodFR was on track for a December 2020/January 2021

completion) in July 2019.  This new consultant was able to obtain from WoodFR's consultant the facts that WoodFR had not followed any of the recommended remediation procedures and had not even done the testing needed to determine the scope of the contamination and to determine the remediation that would be required.  With that newly-disclosed information, it then became clear to all on the Storage Cap side that closure of the remediation at the Fall River Facility was in fact years away.

32.     As a result of the Current Owners' and WoodFR's false statements and material omissions, Storage Cap needlessly expended significant sums in investigating the property only to discover and bring to light the facts that the environmental issues were much worse and much more costly to remediate than the Current Owners and WoodFR represented and, accordingly, than Storage Cap originally contemplated and than were the basis for the PSA.  This resulted in Storage Cap spending large amounts of money doing its due diligence, and eventually led it to pull this deal out of the PSA.

33.     After discovering the true state of affairs, Storage Cap terminated the PSA as it pertained to the Fall River Facility.

34.     Notwithstanding its ability to terminate the PSA as to the Fall River Facility, Storage Cap has been damaged as a direct and proximate result of the Current Owners' and WoodFR's misrepresentations and material omissions.

**C.     The Background for and Provisions of the PSA Affecting Storage Cap's Purchase of the Property Located at 91 Cove Street, New Bedford**

35.     DLWFT is the owner of the real property located at 91 Cove Street in the City of New Bedford, Massachusetts.

36.     Pursuant to a ground lease, DLWFT was the lessor and WoodNB the ground lessee of the 91 Cove Street property.  WoodNB is also the owner of the improvements for a

self-storage facility, located at 91 Cove Street, which improvements and real property, together with DLWFT's interests in any personal property, are collectively referred to herein as the "New Bedford Facility".

37.     WoodNB and DLWFT were and are in the process of constructing certain improvements to the New Bedford Facility, which, when completed, will be a three-story, 90,000 square foot, self-storage facility.  That self-storage facility is located within a single structure totaling 190,000 square feet, of which the remaining 100,000 square feet is vacant (but available for future expansion).

38.     The PSA provided for Storage Cap to purchase 100% of the membership interests in New LLC1, which the Current Owners were to form to be the owner of the New Bedford Facility, for $9.5 million.

39.     Before the closing of the transactions in the PSA, WoodNB and DLWFT agreed they would merge, terminate the ground lease, or enter into some similar transaction (that required Storage Cap's approval), and then sell, transfer and assign all of their interests in the New Bedford Facility to New LLC1.  Storage Cap believes that merger, termination or similar transaction has not yet occurred (and it has not been asked to approve any manner of similar transaction).

40.     The Current Owners were then to sell 100% of their membership interests in and to the New LLC1 to Storage Cap (or its designated affiliate).  [PSA § 2.1].

41.     The entire purpose of the transaction and the value of the membership interests in New LLC1 was and is, and was known to all of the parties and persons involved to be, the existing structure, current improvements, and construction WoodNB and DLWFT were to perform in accordance with the plans the City of New Bedford had approved.

42.     The parties included in the assets to be sold to Storage Cap "Intangible Personal Property" which they agreed includes "any permits, governmental approvals, applications, licenses, drawings, specifications, plans . . ." [PSA §§ 2.1.4, 2.1.5], and all governmental filings [PSA § 2.1.11].  Thus, the parties recognized the central importance to the PSA transaction of the plans and governmental filings for the construction of the 90,000 square feet of self-storage improvements to the New Bedford Facility.

43.     To induce Storage Cap to enter into the PSA, WoodNB, DLWFT, and the Current Owners provided to Storage Cap, either directly or through their authorized agents, a copy of the plans to construct the additional 90,000 square feet of self-storage facility improvements on the New Bedford Facility, which plans they had previously submitted to the City of New Bedford and the City had approved.

44.     Once signed, the PSA provided for:

(a)     A two-business-day period following the April 8, 2020 Effective Date, defined as the "Current Owners/Company Information Delivery Date" [PSA § 1.1.7], at the close of which WoodNB and the Current Owners were to have provided Storage Cap the information and materials set forth in Section 4.1 of the PSA.

These materials included Current Owners and Companies' deliverables due on or before the Information Date, which, in turn, included (1) building plans and specifications [PSA § 4.1.8], and (2) licenses, permits and certificates of occupancy [PSA § 4.1.9].

(b)     A thirty-day "Inspection Period" starting on the April 8, 2020 Effective Date [PSA § 1.1.10].

45.     Pursuant to the June 5, 2020 First Amendment to Agreement of Purchase and Sale, the parties extended the Inspection Period to June 12, 2020.

46.     Farrar signed that First Amendment on June 5, 2020 as a manager of both WoodNB and DLWFT.

47.     Further demonstrating the importance of the City-approved plans, on June 11, 2020, John Christopher, acting as the authorized representative of WoodNB, provided Storage Cap's real estate broker at Colliers International with the City of New Bedford Planning Board's March 14, 2018 Notice of Decision in Case No. 18-12 (recorded in the Registry of Deeds, at Book 12416, Page 33, on April 19, 2018).

48.     Mr. Christopher and WoodNB provided the Notice of Decision with the purpose and intent that the broker would provide it to Storage Cap and Storage Cap would rely on it. Also on June 11, 2020, Colliers International forwarded that Notice of Decision to Chris Harris, Storage Cap's CEO, and Edward Moran.

49.     In the City's Notice of Decision approving a Special Permit on WoodNB's application as the record owner, the City included the following among the conditions for approval of the WoodNB project remodeling the New Bedford Facility:

(a)     as a special condition, WoodNB was required to submit to the City Planner and Department of Inspectional Services a "final revised set of architectural and engineering plans . . . ensuring no discrepancies between plans."

(b)     as general conditions, the City directed:  (i) "that the project shall be undertaken according to the plans submitted with the application"; and (ii) the applicant "shall submit any proposed modification from the approved plans for consideration to the

City Planner for determination as to whether the modified plan must return before this Board for further review".

50.     Pursuant to the June 11, 2020 Second Amendment to Agreement of Purchase and Sale, the parties extended the Inspection Period to June 17, 2020.

51.     On June 17, 2020, the parties entered into a Third Amendment to Agreement of Purchase and Sale.  There, pertinent to the 91 Cove Street property, the parties amended Section 7.3 of the PSA.  In recognition of the fact that the purchase of the New Bedford Facility involved the construction of the new 90,000 square foot building and associated facilities, the parties amended the PSA to establish the Closing Date for the purchase of the membership interests in New LLC1 as

> the later of thirty (30) days after the end of the Inspection Period, or ten (10) business days after Seller provides Purchaser with a copy of the final certificate of occupancy on the New Bedford Facility and at least seventy-three (73) parking Caps are striped to satisfy local governmental requirements.

52.     On May 15, 2020, WoodNB told the real estate broker at Colliers International and Colliers International relayed to Storage Cap (Chris Harris and Edward Moran) that WoodNB expected the City of New Bedford to issue the COO for the New Bedford Facility on May 27 or May 28, 2020.

53.     WoodNB and DLWFT did not obtain the COO in late May 2020.

54.     Acting on behalf of WoodNB and DLWFT, Wood and Farrar told Storage Cap and the broker at Colliers International on phone calls that elevators were one of the last approvals they needed to obtain the COO. On June 9, 2020, Wood provided the broker with a closeout package for the elevators and said:  "Please forward to Chris [Harris]." On June 10, the broker provided that closeout package to Messrs. Harris and Moran, corroborating Storage Cap's expectations that WoodNB and DLWFT would deliver the COO in June.

55.     It was important to Storage Cap that the COO be delivered in June, which facts it disclosed to WoodNB and DLWFT, so that Storage Cap could start leasing storage units on the property to capture the summer leasing season.

56.     WoodNB and DLWFT did not deliver the COO in June, or in July.  When June and July ended and there was still no COO, Storage Cap was concerned and needed to act so that it did not miss the entire summer season. The financial repercussions of missing the season would have a material impact on property returns and the valuation of the asset.

57.     Accordingly, Storage Cap Management entered into the Temporary Property Management Agreement and hired managers to perform the services under that agreement, the expenses of which Storage Cap Management has incurred and continues to incur.

58.     The Closing has not taken place in no small part because the Seller has yet to obtain and provide Storage Cap with a final COO.

59.     Storage Cap also had the continuing right to inspect the New Bedford Facility after the original Inspection Period and as the parties extended the Inspection Period, which right the parties included in their agreement because the construction of the additional improvements was an ongoing project.

**D.     The Planned and Represented Construction of the 90,000 Square Feet of New Self-Storage Improvements at the New Bedford Facility**

60.     During the original Inspection Period, Storage Cap's representatives toured the New Bedford Facility.  At that time, WoodNB and DLWFT were in the middle of their construction of the 90,000 square feet of improvements that WoodNB and DLWFT represented they were undertaking pursuant to the plans submitted to and approved by the City of New Bedford.  Also at that time, all three floors of the facility were in various stages of construction.

12

61.     Because the construction of the improvements was not complete, Storage Cap was not able to verify that WoodNB and DLWFT had complied with the plans the City of New Bedford had approved.  Accordingly, Storage Cap reasonably relied on their representations, both express and implied from their provision of the plans to Storage Cap, that they would construct the improvements in accordance with the City-approved plans.

62.     More specifically, in a March 2020 visit to the New Bedford Facility, Chris Harris, Storage Cap's CEO (and the Storage Cap representative that signed the PSA), inspected the site at a point when the entire facility was still under construction.

63.     Because WoodNB and DLWFT had not completed the construction of the improvements to the self-storage facility, WoodNB and DLWFT held out the plans and the partially constructed first floor as a basic fact and representation as to how they would construct the remainder of the 90,000 square foot facility.  As these were basic facts forming a basis for the entire transaction, Storage Cap expected WoodNB and DLWFT to proceed with the remaining construction adhering to the City-approved plans and consistent with the construction it had verified on the initial site inspection.  Storage Cap relied on the existence and accuracy of these basic facts, and went forward reasonably assuming those facts to be accurate as a basis for the entire PSA transaction.

64.     The level and quality of the construction employed up to Mr. Harris' site visit, and compliance with the plans the City of New Bedford had approved and WoodNB and DLWFT had provided to Storage Cap, therefore became the essence of the PSA transaction, were important parts of the substance of that for which the parties bargained and addressed in their transaction, and were the basis on which Storage Cap agreed (a) to proceed with the PSA,

(b) to not terminate the PSA during the Inspection Period, and (c) to continue with the PSA transaction following the Inspection Period.

65.     While the PSA provided that Physical Due Diligence would continue until Closing [PSA § 4.2], Storage Cap's rights to terminate the PSA based on its inspection of the New Bedford Facility only extended through the Inspection Period [PSA § 4.3] such that its $300,000 earnest money deposit would no longer be refundable after the close of the Inspection Period on June 17, 2020.

66.     Pursuant to Section 6.1 of the PSA, the Current Owners, WoodNB and DLWFT agreed they would "conduct business in the ordinary and regular course in substantially the same manner heretofore conducted (including any conduct that is reasonably related, complementary or incidental thereto)."

67.     Further, WoodNB and DLWFT agreed they could not, without Storage Cap's consent, amend "any material contract."  [PSA § 6.1(c)].  Storage Cap did not consent, and defendants did not ask it to consent, to any change in the contracts for the construction of the 90,000 square feet of self-storage improvements, which contracts were a material part of the consideration for the PSA.

68.     Section 6.1 of the PSA provided Storage Cap with additional assurances that the Current Owners, WoodNB and DLWFT would complete the construction of the 90,000 square feet of self-storage improvements at the New Bedford Facility in accordance with the City-approved plans and consistent with what they had shown Storage Cap during the initial inspection.

69.     The Current Owners, WoodNB and DLWFT provided the applications and issued permits to Storage Cap during the due diligence process knowing and with the intent that Storage

Cap would rely on them and that they were material to Storage Cap's decision to proceed with the PSA.

70.     During the course of the parties' conversations, WoodNB and DLWFT introduced Storage Cap to John Christopher, and by both their specific words and actions, and the documents they provided Storage Cap, led it to believe that Mr. Christopher was the general contractor handling the construction of the additional 90,000 square feet of self-storage improvements.

71.     Mr. Christopher is listed as the "general contractor" on the applications for permits and permits the City of New Bedford has issued for the construction of the self-storage improvements at the New Bedford Facility.

72.     Based on the information the Commonwealth's Division of Professional Licensure publishes on its website concerning professional licensing, Storage Cap is informed and on that basis believes Mr. Christopher is not a registered design professional (and is neither a licensed engineer or architect).

**E.     Mr. Christopher's Statements Regarding How WoodNB and DLWFT Were Proceeding With Construction After Signing the PSA and How It Intends to Continue to Proceed**

73.     Storage Cap toured the New Bedford Facility in September 2020 to investigate how close the construction of the 90,000 square feet of self-storage improvements was to being completed.  Storage Cap reasonably assumed, based on all that the Current Owners, WoodNB and DLWFT had said to it, the approved plans and the previously inspected construction of the improvements, that construction would have proceeded in accordance with the plans submitted to and approved by the City of New Bedford.

74.     Although construction was to have been completed months earlier and a COO was to have been issued in June, at the time of Storage Cap's September visit, the project was in

such a state of disarray that Storage Cap believed it was not, and could not reasonably be considered to be, finished.

76. In addition, the construction was nowhere near the same level of quality of construction and materials that WoodNB and DLWFT had employed with the construction that had been performed up to the time of the first inspection and that WoodNB and DLWFT had held out to Storage Cap as the manner in which they would complete the construction.

76. Remarkably, Mr. Christopher advised Storage Cap that WoodNB was ready to apply for a COO, and the condition of the project at that time was the condition of the project WoodNB intended to convey via the sale and Storage Cap's purchase of the membership interests in New LLC1.

77. Mr. Christopher's stated rationale attempting to explain away the shoddy and sub-standard work that had been done in this construction following the signing of the PSA, and the deviations from the level of materials and construction WoodNB and DLWFT had employed up to the time of the first inspection and that WoodNB and DLWFT had used to induce Storage Cap to enter into the PSA, was that WoodNB and DLWFT were "value engineering" the project.

78. The reality is vastly different. Once it had a signed PSA in place, WoodNB and DLWFT began making material changes to the construction, cutting all manner of corners, constructing and having constructed a project that will require somewhere between $500,000 to $1,500,000 to bring it up to the level of the construction that had been done when first inspected and as needed to comply with the City-approved plans.

79. As but one example, WoodNB and DLWFT did not follow the lighting layout on the plans, did not install the lights as the plans specified, did not hang the lights that do exist in the manner in which the plans provide, and did not install motion sensors as shown on the plans.

The current layout of the lighting is such that it is useless to customers, negatively impacts safety, and creates ongoing costs that were not originally contemplated.  Even if Storage Cap were to install motion sensors, the lighting is currently laid out such that they would never shut off.  The result creates extremely high electric bills (300%+) as compared to what Storage Cap normally sees for a facility of this size.

80.     Upon construction completion, the architect and/or engineer and the contractor must submit affidavits certifying that the New Bedford Facility was built in accordance with the approved plans and all applicable codes, which affidavits must be submitted before the City will issue the COO.

81.     The City of New Bedford's Ordinance 5436 directs that "[n]o deviation from an approved site plan shall be permitted without modification [of that site plan]."  One of the material issues holding up the City of New Bedford's issuance of the COO – a condition precedent to the closing as set forth in the PSA – is that WoodNB and DLWFT have put in place a sidewalk, gate and fencing that do not conform to the approved plans, and they did not submit those changes to the City for its approval.  Notwithstanding the provisions of that municipal ordinance, Storage Cap is informed by the lack of any disclosure from WoodNB and DLWFT that they were undertaking any such effort, and on that basis believes, that neither WoodNB nor DLWFT obtained the required approval of a modified site plan.

82.     As the Seller and its agents, WoodNB, DLWFT, Wood and Farrar were obligated in connection with this business transaction to exercise reasonable care to disclose to Storage Cap, before the transaction was consummated with the signing of the PSA, or, at the very least, before the end of the Inspection Period at which time Storage Cap no longer had the right to terminate the PSA and recover its earnest money deposit, that upon signing the PSA WoodNB

and DLWFT intended to undertake what they euphemistically and misleadingly called "value engineering."  WoodNB, DLWFT, Wood and Farrar were obligated to provide this information to Storage Cap because:  (a) these were matters known to them that they each knew, or should have known, were necessary to be disclosed to prevent each of their partial or ambiguous statements of fact from being misleading; (b) they each knew that Storage Cap was about to enter into the PSA transaction under a mistaken belief as to those basic facts and the undisclosed facts; and (c) they knew or should have known that Storage Cap, because of the information they had provided, the customs of the trade and the other objective circumstances of having provided the City of New Bedford plans for approval and received the approval of those plans, would reasonably expect them to disclose any changes to the plans the City of New Bedford had approved.

**F.      WoodNB, DLWFT, Wood and Farrar's Misrepresentations Concerning the Identity of the General Contractor for the Project on the New Bedford Facility**

83.      When Storage Cap learned of the facts that WoodNB and DLWFT had made numerous material changes to the plans and scope of work for completing the construction of the 90,000 square feet of self-storage improvements, it first attempted to determine whether the plans Mr. Christopher had submitted to the City of New Bedford were the same plans WoodNB and DLWFT had provided and Storage Cap had received and reviewed during the Inspection Period.

84.      On September 30, 2020, WoodNB and DLWFT confirmed the plans they had submitted to the City of New Bedford were the same plans they had provided to Storage Cap.

85.      In an effort to understand better just exactly what WoodNB and DLWFT had done (or not done, as the case may be) in unilaterally making the material changes to the plans and scope of work at the New Bedford Facility, Storage Cap asked WoodNB and DLWFT to

provide it with copies of the change orders pursuant to which Mr. Christopher (and his crew and subcontractors) had received the owner's permission to deviate from the approved plans, together with the supporting documentation including, among other things, revised budgets and bank draws.

86.     Storage Cap asked for this documentation because it required the information and because it is industry standard that when a general contractor and/or its subcontractors depart from the plans and specifications for a construction project, it and/or they do so pursuant to a written change order documenting the change and the resulting impact, if any, on the costs of the project.

87.     In response, Mr. Christopher and Farrar (on behalf of Wood, WoodNB and DLWFT) told Storage Cap that there were no change orders, that WoodNB was acting as the general contractor on this project, that Mr. Christopher was merely the construction manager, and that, because of this previously undisclosed arrangement, all of the changes were implemented by undocumented, verbal instructions.

88.     More specifically, in a September 30, 2020 email to Storage Cap, Farrar said: "There were no official 'change orders' that would be seen with a full AIA contract agreement. John C. Was [*sic*] a construction manager".

89.     Based on a search of the public records of the Commonwealth's Division of Professional Licensure, Storage Cap is informed and on that basis believes that only Mr. Christopher holds an active license as a construction supervisor, and that neither WoodNB, DLWFT, nor the two LLCs' managers, Wood and Farrar, are licensed to act as general contractors in the Commonwealth.

90.     Demonstrating that the structure WoodNB and DLWFT says was the case is a sham and an artifice, Massachusetts requires that a party wishing to act as a general contractor register with Massachusetts Secretary of State, as well as provide necessary documentation, permits, and a certificate of insurance; none of which WoodNB and DLWFT have done.

**G.     Operation of the Self-Storage Facility at 91 Cove Street**

91.     Pursuant to the ground lease between WoodNB and DLWFT, DLWFT had constructed certain improvements and operated the self-storage business on the 91 Cove Street property.

92.     Pursuant to the July 2020 Temporary Property Management Agreement and the PSA, WoodNB and DLWFT wanted to retain Storage Cap Management, and Storage Cap Management agreed, to undertake the operation of the New Bedford Facility as the sole and exclusive manager of the New Bedford Facility until the Closing of the PSA.

93.     Storage Cap Management did not charge a separate management fee for providing these services, but was instead entitled to retain all revenues from the New Bedford Facility (net of those costs and expenses of the New Bedford Facility for which Storage Cap Management was responsible under that Temporary Property Management Agreement).

94.     The parties' intent in entering into the Temporary Property Management Agreement was that this agreement would "bridge" the short period from the date of the City's issuance of the COO to the closing of the PSA.

95.      However, WoodNB and DLWFT have unreasonably delayed in obtaining and/or have not been able to obtain a COO, and, as a result, this temporary agreement has been applied for a longer period than the parties intended.  There is still today no COO and no closing scheduled.

96.     In the early part of September, WoodNB and DLWFT obtained a temporary certificate of occupancy ("TCO") for the New Bedford Facility.  Under that TCO, Storage Cap Management has been able to start leasing self-storage units at the New Bedford Facility in an attempt to generate at least some revenue and to mitigate its damages described in this Complaint.

97.     Further pursuant to the Temporary Property Management Agreement, the new contracts for renting self-storage units are all between Storage Cap Management and the various lessees, and not WoodNB or DLWFT.  As a result, the economic and reputational risk of default on rental contracts for the units that are a deficient product or provide an unsatisfactory customer experience lies with Storage Cap Management and Storage Cap.  Accordingly, Storage Cap Management has continued to pay the operating expenses of the New Bedford Facility, the costs of which are nearly 300% higher than standard operation expenses for a similarly sized facility due to the material changes WoodNB and DLWFT made to the electrical plan and the failure to install motion sensors.  Storage Cap Management's actions have allowed power and lights to stay on at the building in an attempt to ensure the parties renting units do not have complaints or issues with the constructive termination of their contracts that would occur if it were not to pay those expenses.

98.     Storage Cap Management has been paying the utility bills and other operating expenses for the facility as the Temporary Property Management Agreement provides since July, and has done so notwithstanding the absence of revenue for the new improvements in July and August, and the fact that it is now covering a period far longer than either side had contemplated would be the case.

99.     Storage Cap Management has been paying these bills while waiting for the COO to issue, doing so in good faith and with the hope that the parties will be able to close the transaction under the PSA once WoodNB and DLWFT have either remedied the deficient construction, including what they have labeled as "value engineering" changes, or paid for the new facility to be constructed as represented.

### FIRST CLAIM FOR RELIEF
### (Fraudulent Inducement of the PSA for New Bedford)

100.     Plaintiffs repeat and reallege the allegations of paragraphs 1-99 as if set forth fully herein.

101.     WoodNB, DLWFT, Wood and Farrar, either directly or indirectly through their agents, made false representations to Storage Cap, or omitted to disclose material facts with the purpose and intent of communicating a false impression to Storage Cap.  They did so both in providing the City-approved plans to Storage Cap in the due diligence process and in making available for inspection the partially completed improvements in March 2020.

102.     It was a material fact and foundation for Storage Cap's decision to enter into the PSA that the building would be constructed according to the plans the City of New Bedford had approved, without deviation.

103.     WoodNB and DLWFT provided the City-approved plans to Storage Cap intending and knowing that Storage Cap would rely on those as the plans and the level of construction to which WoodNB and DLWFT would complete the improvements.

104.     WoodNB and DLWFT provided the City-approved plans and provided a tour of the partially constructed floors knowing that, if Storage Cap should elect to proceed, WoodNB and DLWFT would then complete the construction in an entirely different, and inferior, fashion.

105.    WoodNB and DLWFT provided the City-approved plans and the inspection of the partially constructed floors of the project for the purpose of inducing Storage Cap to proceed with the purchase of either the membership interests in New LLC1 or the fee interest to the 91 Cove Street property, either or both as set forth in the PSA.

106.    Storage Cap relied upon the express and implied representations that the construction would proceed as per the City-approved plans as being true, and acted upon those representations to its detriment in entering into PSA transaction and proceeding with it following the Inspection Period.

107.    Storage Cap further relied on the fact that WoodNB and DLWFT would not make material changes to the construction of the improvements, and on the absence of a plan by WoodNB and DLWFT to complete the construction in an inferior and materially divergent manner.

108.    Storage Cap's reliance upon WoodNB and DLWFT's misrepresentations was and is reasonable.

109.    There is nothing on the face of the PSA that would have triggered an alarm for Storage Cap, and nothing in the PSA that would contradict the information WoodNB, DLWFT, Wood and Farrar provided.  Storage Cap's understanding of the PSA agreement was logically colored by the defendants' prior statements and the information they provided.

110.    While the PSA did provide for an Inspection Period, once that period had ended on June 17, 2020, Storage Cap was left with no effective remedy to address WoodNB and DLWFT's changes to the construction.

111.    Because the false statements and omitted facts were based on WoodNB and DLWFT completing the construction in a manner that was as they presented to the City of New

Bedford in the plans the City then approved, which approved plans WoodNB then presented to Storage Cap, these were not matters of opinion or of conditions to exist in the future.

112.    For its remedy, Storage Cap elects to seek damages in an amount it will prove at trial (and not rescission of the PSA).  Storage Cap seeks damages equal to the loss of the benefit of its bargain with WoodNB and DLWFT, in an amount sufficient to remedy the fact that it had agreed to acquire something in this transaction that was of less value than what WoodNB and DLWFT led it to believe it was worth.  And, because there was a contract, Storage Cap also seeks to recover the lost profits it has incurred from having been provided a substandard facility and the resulting loss of income from operations as it undertakes the necessary efforts to return the New Bedford Facility to the condition WoodNB and DLWFT represented.

**SECOND CLAIM FOR RELIEF**
**(Fraudulent Inducement of the Temporary Property Management Agreement)**

113.    Plaintiffs repeat and reallege the allegations of paragraphs 1-112 as if set forth fully herein.

114.    At the time WoodNB and DLWFT entered into the Temporary Property Management Agreement, they each knew they had deviated from the City-approved plans and from the level of construction of the improvements that had been the case when Storage Cap inspected the New Bedford Facility.

115.    At the same time, WoodNB and DLWFT each knew that those deviations from the City-approved plans and level of construction would delay, if not totally impede, their ability to obtain a COO.

116.    WoodNB and DLWFT also knew that Storage Cap Management was not aware of those facts when it signed the Temporary Property Management Agreement.

117.   The entire purpose of the Temporary Property Management Agreement was to serve as a short-term "bridge" until WoodNB and DLWFT obtained the COO, the PSA transaction closed, and Storage Cap or one of its affiliates became the owner.

118.   The short duration of that agreement was a fundamental basis on which Storage Cap Management entered into it, and was a fact WoodNB and DLWFT knew was the basis for that agreement.

119.   In reasonable reliance on the completion of the construction of the improvements consistent with the City-approved plans and to the level and quality of the construction that was in place when Storage Cap initially inspected the New Bedford Facility, and the resulting reasonable expectation that WoodNB and DLWFT would shortly obtain a COO and close the PSA transaction, Storage Cap Management agreed to proceed with providing management services under that agreement, began signing leases for self-storage space, and hired personnel necessary properly to manage the self-storage facility.

120.   As a direct and proximate result of WoodNB and DLWFT's concealment of the true facts from Storage Cap Management, WoodNB and DLWFT fraudulently induced Storage Cap Management to enter into the Temporary Property Management Agreement and have caused Storage Cap Management damages in amounts it will prove at trial.

### THIRD CLAIM FOR RELIEF
### (Fraudulent Inducement of the PSA for Fall River)

121.   Plaintiffs repeat and reallege the allegations of paragraphs 1-120 as if set forth fully herein.

122.   WoodFR represented to Storage Cap that:  (a) the environmental contamination at the Fall River Facility had been defined; (b) a remediation plan was in place; (c) the remediation

plan had been ninety percent completed; and (d) they had put in place an insurance policy that would cover the costs of the remaining ten percent needing to be completed.

123.    WoodFR made those statements with the purpose and intent to induce Storage Cap to enter into the PSA.

124.    Each of the statements in paragraph 122 was false when made, or made with reckless disregard for whether it was true or false.  Storage Cap subsequently discovered that: (a) the environmental contamination at the Fall River Facility had not been defined because, for example, a consultant had recommended that WoodFR undertake a testing program for the purpose of defining the extent of contamination and Wood FR neglected to follow that recommendation; (b) similarly, a remediation plan was an additional step on which WoodFR had failed to follow-through; (c) as a result, the remediation plan had not been ninety percent completed; and (d) the insurance policy would need to cover costs far in excess of what WoodFR had represented to ensure all of the remediation cost were covered.

125.    WoodNB and DLWFT told Chris Harris of Storage Cap that that the ownership of the Fall River Facility would have a clean bill of health on these environmental issues before closing.

126.    WoodFR made the statement in the preceding paragraph with the purpose and intent to induce Storage Cap to enter into the PSA.

127.    The statement in paragraph 125 was false or made with reckless disregard for its truth or falsity for the same reasons as are set forth in paragraph 124.

128.    As a direct and proximate result of WoodFR's false statements inducing Storage Cap to enter into the PSA for the Fall River Facility, Storage Cap has been damaged in amounts it will prove at trial.

## FOURTH CLAIM FOR RELIEF
### (Civil Conspiracy)

129.    Plaintiffs repeat and reallege the allegations of paragraphs 1-128 as if set forth fully herein.

130.    WoodNB, DLWFT, Wood and Farrar had a common design or an agreement to conceal from Storage Cap WoodNB and DLWFT's intent to complete the construction of the remainder of the 90,000 square foot facility not in accordance with the plans filed with and approved by the City of New Bedford.

131.    In furtherance of that common design or agreement, WoodNB, DLWFT, Wood and Farrar deliberately and willfully concealed from Storage Cap their intent to complete the construction of the improvements to the New Bedford Facility in a manner that failed to meet those standards, just as WoodFR, Wood and Farrar concealed the true state of facts concerning the environmental remediation at the Fall River Facility.

132.    Storage Cap is informed and on that basis believes that, in a further effort to conceal the fraudulent inducement of Storage Cap to enter into the PSA for the New Bedford Facility, WoodNB, DLWFT, Wood and/or Farrar instructed Mr. Christopher to attempt to pass-off the execution of their fraud as being "value engineering".

133.    Those statements were deliberately false and misleading.

134.    Similarly, and further to that common design or agreement, WoodNB, DLWFT, Wood and Farrar concealed the true facts from Storage Cap Management to fraudulently induce it to enter into the TPMA.

135.    The purpose and intent of this common design or agreement was to inflict a wrong or injury on Storage Cap by fraudulently inducing it to enter into the PSA and then delivering:  (a) the 90,000 square feet of new construction of improvements to the New Bedford

Facility constructed in a manner that did not support the $9.5 million amount Storage Cap had

agreed to pay for the New Bedford Facility; and (b) the Fall River facility subject to a materially

increased environmental remediation liability.

136.    The further purpose and intent of this common design or agreement was to inflict

wrong or injury on Storage Cap Management by fraudulently inducing it to enter in the TPMA.

137.    As a result of this common design or agreement, and the overt acts WoodNB,

DLWFT, Wood and Farrar undertook pursuant to their common design or agreement as set forth

above, Storage Cap and Storage Cap Management have each been damaged in amounts each will

prove at trial.

### FIFTH CLAIM FOR RELIEF
### (Breach of the PSA Confidentiality for New Bedford)

138.    Plaintiffs repeat and reallege the allegations of paragraphs 1-137 as if set forth

fully herein.

139.    In Section 11.1 of the PSA, the parties agreed each shall

> . . . hold, and use its reasonable best efforts to cause its or their respective
> Representatives to hold in confidence, any and all information, whether
> written or oral, concerning the Business and the transactions contemplated
> by this Agreement, including the existence of this Agreement and
> information regarding the Purchase Price . . .

In addition, that same section goes on to state that the three Companies, the Current Owners and

any Affiliates of the Current Owners, as well as their agents, will not disclose the existence or

terms of the Agreement without Storage Cap's consent.

140.    One of the purposes of this clause and the reason why Storage Cap negotiated to

include it in the PSA is to keep secret the fact of a change in ownership.  In this case, and further

to that purpose, one of the mechanisms Storage Cap negotiated was the acquisition of the entirety

of the ownership entity such that there would not be any public disclosure of a change in

ownership (as would be the case with the acquisition of a fee interest in the property and the resulting recording of transfer documents in the real property records).

141.    In Storage Space's experience, it is often the case that, with a change in ownership, the relevant taxing authorities reassess the value of the property transferred, and most often that reassessment results in the imposition of additional property taxes.

142.    In August 2020, John Christopher, an authorized agent of WoodNB, DLWFT and the Current Owners, while applying for a COO for the New Bedford Facility, disclosed to the City of New Bedford that there was an ownership change occurring.

143.    Because the transfer of commercial properties, such as the New Bedford Facility, are commonly, if not exclusively, done via some manner of written agreement, Mr. Christopher's comment necessarily disclosed the existence of the PSA and the term of the PSA providing for a change in ownership of the New Bedford Facility.

144.    Mr. Christopher made that disclosure without the knowledge or consent of Storage Cap.

145.    Mr. Christopher's disclosure was not made in conjunction with or as part of an effort to market the property to a potential third-party purchaser or its agent as a back-up to the PSA.

146.    Storage Cap has been damaged by that disclosure in amounts it will prove at trial.

WHEREFORE, Plaintiffs pray for the entry of judgment as follows:

A.    Against WoodNB and DLWFT for the damages caused by their fraud inducing Storage Cap to enter into the PSA as to the New Bedford Facility;

B.    Against WoodNB and DLWFT for the damages caused by their fraud inducing Storage Cap Management to enter into the TPMA;

C.       Against WoodFR for the damages caused by its fraud inducing Storage Cap to

enter into the PSA as to the Fall River Facility;

D.       Against all of the defendants, jointly and severally, for the damages caused by

their conspiracy to fraudulently induce Storage Cap to enter into the PSA, and to

fraudulently induce Storage Cap Management to enter into the TPMA;

E.       Against WoodNB, DLWFT and the Current Owners, for damages for breach of

the confidentiality provision of the PSA; and

F.       Awarding such other and further relief as the Court determines is just and proper.

DATED: November 6, 2020.                Respectfully submitted,

_s/ Christopher Hatfield_
Christopher Hatfield (BBO #688386)
BALLARD SPAHR LLP
1909 K Street, NW, 12th Floor
Washington, DC 20006-1157
Telephone: 202-661-2200
Facsimile: 202-661-2299
hatfieldc@ballardspahr.com
_Attorneys for Storage Cap Leasing, LLC and_
_Storage Cap Management, L.P._